UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 3:07-CR-81 |
| | ) | |
| V. | ) | (Philips / Shirley) |
| | ) | |
| ROBERT BENNETT, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the district court as may be appropriate. This matter is before the undersigned upon Defendant Robert Bennett's ("Defendant Bennett") Motion to Suppress Physical Evidence [Doc. 56] filed on January 4, 2008. The government filed a Memorandum in Opposition [Doc. 86]. The parties appeared before the Court on February 13, 2008 for an evidentiary hearing.[1] The government was represented by Assistant United States Attorney Tracee Plowell ("AUSA Plowell"). Attorney Norman McKellar ("Attorney McKellar") represented Defendant Bennett, who was also present. Since neither party requested the filing of post-hearing briefs, the Court took this matter under advisement on February

---

[1] In its response, the government argues Defendant's request for an evidentiary hearing on his Motion to Suppress should be denied [Doc. 86]. The government objects to Defendant's request for a hearing on the grounds that Defendant does not set forth any contested facts requiring a hearing to be held. The government renewed its objection to Defendant's request for a hearing at the evidentiary hearing. However, this Court advised the parties it would defer and hold a hearing in this matter.

1

13, 2008.

I. **Position of the Parties**

Defendant Bennett moves to suppress all physical evidence obtained at the scene of his arrest on July 16, 2007, or subsequent to his arrest, on the basis that his arrest was not supported by probable cause, thus the police were in violation of the Fourth Amendment. Defendant Bennett contends, at the time of his arrest, he was seated in the driver's seat of a Cadillac automobile, which was lawfully parked on a street in east Knoxville. Defendant further argues that without a warrant, police officers surrounded his vehicle and arrested him, which resulted in a subsequent search of his vehicle, revealing a quantity of crack cocaine, an amount of U.S. currency, and a Glock 9mm semiautomatic pistol. Defendant Bennett argues these physical items should be suppressed since the search which yielded them was unlawful.

The government, in response, argues the officers had probable cause to believe that Defendant Bennett had crack cocaine in his vehicle and could lawfully arrest Defendant based on a confidential informant's narcotics controlled buy from Defendant prior to his arrest. The government further contends since the officers had probable cause to arrest Defendant, they were constitutionally permitted to conduct a search of his vehicle incident to his arrest. In the alternative, the government argues that if the Court finds that the officers needed a warrant to search Defendant's vehicle, the officers could properly search the vehicle pursuant to the automobile exception.

II. **Suppression Hearing Testimony**

The only witness called by the government was Special Agent Mickey R. Nocera ("SA

Nocera") of the Federal Bureau of Investigation ("FBI"). SA Nocera has been employed by the FBI, Knoxville Division, for over eleven years and is presently assigned to the Safe Streets Task Force, which investigates violent crimes and drug activity. As to his training, SA Nocera testified he received his basic training at Quantico and that he is a certified undercover agent with the FBI.

SA Nocera was then asked about the FBI's investigation of Defendant Bennett. SA Nocera testified that in July 2007, the FBI began investigating Defendant's involvement in drug activity in East Knoxville and on July 16, 2007, he met with a confidential informant ("CI") to arrange the purchase of narcotics from Defendant. He further stated, in preparation for the controlled buy, he searched the CI, gave the CI $500 to purchase the drugs, and equipped the CI with an audio recording device. SA Nocera then testified that the CI drove to 2745 Lay Avenue, which is the known residence of Defendant's mother. SA Nocera further stated he "surveilled the informant", meaning he followed the CI to a point in which he could observe the CI arrive at 2745 Lay Avenue. He also testified there were other officers conducting surveillance of the Lay Avenue residence. He further stated that when the purchase was over, the CI left the Lay Avenue residence and drove to a designated location, where the police were waiting, gave SA Nocera the drugs purchased and the audio recorder, and advised SA Nocera of the details of the controlled buy. SA Nocera stated it was around 4:45 p.m. when the CI met with him after the controlled buy and that the transaction between the CI and Defendant occurred around 4:30 p.m.

SA Nocera then testified as to what the CI told him in regard to the details of the controlled buy. He stated that the CI advised him that when the CI arrived at the Lay Avenue residence, she was met by a black male who was known by the CI to be Defendant's brother. The CI advised Defendant's brother she wished to purchase "half", to which Defendant's brother advised the CI it

would cost her $500. The CI then told SA Nocera that Defendant's brother directed her to sit in the backseat on the driver's side of Defendant's vehicle, a 1993 purple Cadillac. SA Nocera further stated the CI told him that Defendant Bennet was seated in the driver's seat of the Cadillac and that there were two other people in the vehicle, one man in the front passenger seat who assisted with the transaction and another individual seated in the backseat, next to the CI who was purchasing drugs.

SA Nocera testified he was then told by the CI that the CI told Defendant she needed a "half" and Defendant removed the crack cocaine from the center console of the vehicle and weighed out ½ ounce. The individual in the front passenger seat gave Defendant a bag from the vehicle's glove compartment in order to bag the crack cocaine. At this time, Defendant gave the CI the bag of drugs and she gave Defendant Bennett $500.

SA Nocera then testified that he did not see the CI enter Defendant's vehicle, but that he was advised by the CI that the transaction took place in the Cadillac and the recording equipment worn by the CI confirmed that she entered the vehicle. SA Nocera testified the recorder was an actual body recording, not a transmitter, so he was unable to listen to the transaction as it occurred, but reviewed it later. SA Nocera further testified that he "de-briefed" the CI upon her return to their designated meeting place, which included searching her and her vehicle, recovering the drugs purchased, field testing the drugs, and weighing the drugs. SA Nocera then stated he called the U.S. Attorney's Office and spoke with AUSA Plowell, who authorized a probable cause arrest after being apprised of the details of the controlled buy between the CI and Defendant.

In regards to Defendant's arrest, SA Nocera testified that after AUSA Plowell authorized the arrest, Defendant Bennet was arrested within one hour. He further stated Defendant was located in

the same purple Cadillac as the CI informed him the controlled buy had taken place in, but the vehicle was now down the street from the Lay Avenue residence. SA Nocera then stated that their was another individual in the Cadillac with the Defendant who was not the same individual from earlier in the afternoon who helped weigh the crack cocaine. SA Nocera testified the individual with Defendant at the time of his arrest was temporarily detained. After SA Nocera arrested Defendant, he saw a baggie with a large amount of drugs and the barrel of a pistol in the vehicle. The pistol was determined to be a Glock 9mm semiautomatic pistol with an "extended magazine." The gun was loaded, having a 15 round magazine with 1 round in the chamber. SA Nocera further testified he recovered a cell phone and about $2,800 in cash from Defendant.

On cross-examination, SA Nocera was asked whether he witnessed the alleged controlled buy on July 16, 2007, to which he replied no. SA Nocera stated his knowledge of the transaction came from what the CI told him and his reviewing of the audio recording, which were consistent. He further stated he did not listen to the audio recording of the transaction immediately, but that he reviewed it a week or two after Defendant's arrest. SA Nocera testified the decision to arrest Defendant Bennet was based on the information the CI told him as well as the crack cocaine purchased by the CI, which field-tested positive. He acknowledged he did not see the alleged controlled buy take place, but that he saw the CI go to the Lay Avenue residence and leave the residence.

SA Nocera was then asked about the reliability of the CI. He testified that he has known her for about one year as of the date of the hearing and knew her for about four or five months at the time of the controlled buy with Defendant. He further testified that he previously used her in other controlled buys and was deemed reliable as she had provided accurate information in the past

5

regarding the transactions she participated in. He was not aware of any information indicating she was not reliable. When asked about the CI's previous involvement with Defendant Bennett, SA Nocera testified the CI had not been involved with the Defendant prior to the controlled buy on July 14. He further stated he did not think the CI was facing any criminal charges.

SA Nocera was then asked to focus his testimony on the events leading up to July 16, 2007, the date of Defendant's arrest. SA Nocera testified he had been aware of Defendant for some time since his name had come up in investigations as an individual involved in selling drugs in East Knoxville. He further stated audio recordings of other controlled buys involving Defendant have been turned over to AUSA Plowell, but they are not related to this indictment.

SA Nocera further testified that Defendant does not live at his mother's residence on Lay Avenue, but that he deals narcotics out of that location, either from the purple Cadillac he was arrested in or a white Buick LeSabre. SA Nocera stated that the CI provided a cell phone number for Defendant and tried to initiate a call to Defendant to arrange the controlled buy, but was unable to reach him. SA Nocera further testified the police had previously recorded Defendant at the phone number used by the CI. SA Nocera then stated he gave the CI $500 in $20 bills, which were unmarked. He further stated that the money was not photocopied, even though photocopying the money is usual practice in controlled buys. SA Nocera further testified that he followed the CI to the Lay Avenue residence, waited for the CI to complete the transaction, and then followed the CI back to the designated meeting location. He confirmed he tailed the CI to the residence and back and also confirmed the CI went to the residence and no where else. He further stated these locations were about five to fifteen minutes from each other.

SA Nocera was then asked why he did not arrest Defendant Bennett as soon as the controlled

buy was completed.  SA Nocera stated he waited to arrest Defendant for three reasons: (1) due to safety concerns regarding the CI; (2) he needed to confirm with the CI that the buy took place; and (3) he wanted to field test the drugs to confirm crack cocaine was in face purchased by the CI.  He further stated that when making the decision to arrest Defendant, he had not reviewed any of the audio recordings, but that he relied on the CI's statement and the positive field test of the crack cocaine.  He stated the CI informed him that she purchased half an ounce of crack cocaine, which tested positive for crack cocaine in the field test, and that the CI also disclosed the parameters of the buy.

When asked whether he arrested Defendant's brother, Ron Elder, SA Nocera stated he did not arrest him because the charging decision came from the U.S. Attorney's Office.  SA Nocera further testified that the unknown male seated next to Defendant during the controlled buy was not arrested either.  SA Nocera further testified he believed Defendant's sister's name is on the vehicle registration for the Cadillac.

SA Nocera testified about an hour passed from the time he saw the CI leave Defendant's vehicle until his arrest.  He stated that he did not think Defendant was planning on fleeing because he was "posted up" meaning "open for business", but he felt it was a good time to effectuate Defendant's arrest.  SA Nocera testified that he feared it might be difficult to locate him later, and although he did not keep constant surveillance on Defendant, he did spot checks on him.  He further stated it was a tactical decision to arrest him based on probable cause since he had the time to obtain an arrest warrant.

SA Nocera stated that when he approached the vehicle, Defendant was seated in the driver's seat and SA Nocera approached the vehicle from the rear passenger side.  SA Nocera testified he

7

told Defendant he was under arrest for distribution of crack cocaine and then when he saw the gun, he asked Defendant whether he wanted to cooperate. SA Nocera then stated when the officers approached the vehicle, Defendant exited the car and was placed in handcuffs. SA Nocera further testified that the search of the vehicle happened about ten seconds later and the purpose of the search was protective in nature. SA Nocera stated that from the outside of the vehicle he could plainly see a plastic baggie and the barrel of a gun, thus he searched the vehicle to see if anyone else was in it or if there were any other weapons in the vehicle.

SA Nocera further stated that he had time to obtain a search warrant prior to the arrest, but did not. He testified he got one the next day.

On redirect examination, SA Nocera stated that the CI provided intelligence about narcotics trafficking of Defendant Bennett and others, which was corroborated by other informants and other investigative techniques. SA Nocera further testified that this was a "buy and walk" situation as opposed to a "buy and bust" situation. In a "buy and walk", the CI comes back to the police with the narcotics purchased, the police conduct an interview, collect the evidence, and then determined their next investigative step, usually with the assistance of the U.S. Attorney's Office. In a "buy and bust", the CI buys the drugs and then the police effectuate the arrest once a signal is given by the CI that the transaction is complete.

Defense counsel did not conduct recross examination.

**III.  Findings of Fact**

The Court finds that in July 2007, the FBI began investigating Defendant Bennett in relation to his possible participation in drug trafficking in East Knoxville and on July 16, 2007, SA Nocera

8

met with a CI to arrange a controlled buy of narcotics from Defendant. SA Nocera knew the CI for about four to five months prior to her participation in this particular controlled buy. SA Nocera had previously used her to orchestrate controlled buys of drugs and the information given to him regarding those transactions was accurate and reliable.

In preparation for the CI to buy narcotics from Defendant, SA Nocera searched the CI, gave her $500 in $20 unmarked bills to make the buy, and equipped the CI with a recording device. The CI first attempted to reach Defendant on his cell phone to set up the purchase, but was unable to reach him. The CI then drove to 2745 Lay Avenue, Knoxville, the residence of Defendant's mother, in order to effectuate the buy. SA Nocera followed the CI to the Lay Avenue residence, where there were other officers present who were able to conduct further surveillance. SA Nocera did not he witness the controlled buy.

Upon arriving at the Lay Avenue residence, the CI was met by Defendant's brother, Ron Elder. The CI told Mr. Elder she wished to purchase a "half" and Mr. Elder told the CI she would be charged $500. Mr. Elder then directed the CI to sit in the backseat of Defendant's Cadillac. The CI was seated directly behind Defendant, who was in the driver's seat. Additionally, there were two other people in the car: a man in the front passenger seat helping with the drug transaction and a man in the backseat with the CI, who was also making a purchase.

The CI then told Defendant Bennett she wished to purchase a "half" of crack cocaine. Defendant then removed the crack cocaine from the center console of his vehicle and weighed out ½ ounce. The individual sitting in the front passenger seat gave Defendant a bag from the glove compartment to put the crack cocaine in and then Defendant gave the bag to the CI. In return, the CI gave Defendant the $500 the police gave her in order to make the purchase. The CI then left

9

Defendant's Cadillac, with the half ounce, and returned back to the agreed upon place to de-brief the police. SA Nocera waited for the CI to complete the controlled buy and then followed her back to their designated meeting location once she left the Lay Avenue residence.

When the CI arrived at the location to de-brief the police, SA Nocera conducted a search of her and her vehicle, recovered the crack cocaine from her in order to field test it, and weighed the crack cocaine. The field test confirmed the drugs purchased were crack cocaine. At this point, SA Nocera called AUSA Plowell to advise her of the details of the controlled buy and to get approval for a probable cause arrest.

When SA Nocera returned to area of the Lay Avenue residence about an hour later, he found Defendant in the same purple Cadillac that the CI purchased the drugs in, but Defendant was now sitting in the parked vehicle down the street from the Lay Avenue residence. Defendant was sitting in the driver's side seat and SA Nocera approached the car from the rear passenger side. There was another individual in the vehicle with Defendant, but it was not the same person as was in the car when the CI purchased the drugs. Defendant was advised he was under arrest for distribution of crack cocaine, asked to exit the vehicle, and placed under arrest for distribution of crack cocaine. From the outside of the vehicle, SA Nocera could see a baggie which contained a large amount of drugs and the barrel of a pistol under the seat in the vehicle. The pistol was a Glock 9mm semiautomatic with a 15 round magazine, 1 round in the chamber. A cell phone and about $2,800 in cash was recovered from Defendant Bennett's person. SA Nocera also conducted a protective search of the vehicle.

## IV. Analysis

Defendant Bennett contends that his rights under the Fourth Amendment were violated when the police arrested him on July 16, 2007 without probable cause. Defendant Bennett further argues since his arrest was unlawful, any physical evidence seized by the police from his vehicle should be suppressed. The government, in response, contends the physical evidence recovered from Defendant's vehicle was lawfully obtained. The government contends Defendant's arrest was supported by probable cause based upon the CI's narcotics purchase that occurred an hour prior to the arrest and any subsequent search of Defendant's vehicle was lawful under the search incident to arrest doctrine.

### A. Probable Cause

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation...." U.S. Const. amend. IV. In the absence of a warrant, a person may be seized only where there is probable cause to believe a felony is being or has been committed by the arrested individual, based upon the totality of the circumstances. See Illinois v. Gates, 462 U.S. 213, 230-31 (1983); United States v. Caidedo, 85 F.3d 1184, 1192 (6th Cir. 1996). Thus, a warrantless arrest must be supported by the existence of probable cause of sufficient weight to support a believe that the *"individual detained committed a criminal offense*." United States v. McNeal, 955 F.2d 1067, 1071 (6th Cir. 1992) (emphasis in original). An arrest without probable cause violates the Fourth Amendment. Crockett v. Cumberland Coll., 316 F.3d 571, 580 (6th Cir. 2003).

Probable cause to arrest has been defined as "facts and circumstances within the officer's

knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Michigan v. DeFillippo, 443 U.S. 31, 37 (1979). "[T]he existence of probable cause should be determined by the totality of the circumstances. This totality of the circumstances analysis includes a realistic assessment of the situation from a law enforcement officer's perspective." United States v. Ferguson, 8 F.3d 385, 392 (6th Cir. 1993) (citations omitted). "The probability of criminal activity is assessed under a reasonableness standard based on 'an examination of all facts and circumstances *within an officer's knowledge at the time of an arrest.*'" Crockett, 316 F.3d at 580 (quoting Estate of Dietrich v. Burrows, 167 F.3d 1007, 1012 (6th Cir. 1999)) (emphasis in original).

In determining whether a tip by a confidential informant establishes probable cause, a court must look at the totality of the circumstances. United States v. Smith, 182 F.2d 473, 477 (6th Cir. 1999). In doing so, a court is to consider the veracity, reliability, and basis of knowledge of the informant. Courts, however, have "never required that informants used by the police be infallible." Illinois v. Gates, 462 U.S. 213, 246 (1983). It is reasonable to believe that an informant who has provided reliable information in the past will be reliable in the present. See United States v. Wagner, 989 F.2d 69, 72-72 (2d Cir. 1993) ("Information may be sufficiently reliable to support a probable cause finding if the person providing the information has a track record of providing reliable information."). Additionally, information provided by first hand observation is considered more reliable than information obtained second hand. See United States v. Harris, 255 F.3d 288, 293 (6th Cir.) (noting that two controlled purchases by confidential informant with history of reliability played key role in establishing probable cause), cert. denied, 534 U.S. 966 (2001); United States v. Murphy, 241 F.3d 477, 458 (6th Cir.) (finding probable cause to search defendant's hotel

room where police observed controlled purchase of crack cocaine made by confidential informant outside hotel room, observed defendant return to hotel room after the transaction, and overhead telephone conversation between informant and defendant arranging the purchase), cert. denied, 532 U.S. 1044 (2001). Even when making a warrantless arrest, a law enforcement officer "may rely upon information received through an informant, rather than upon his direct observations, so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge." Gates, 462 U.S. at 242 (citation omitted).

In the instant case, the evidence indicates SA Nocera had probable cause to arrest Defendant without a warrant. SA Nocera approached Defendant Bennet only after he corroborated the CI's report that Defendant was selling crack cocaine from the Lay Avenue residence. Specifically, on July 16, 2007, at approximately 4:30 p.m., the CI made a controlled buy of half an ounce of crack cocaine from Defendant with $500, money which was given to the CI by SA Nocera for the purpose of buying the crack cocaine. Additionally, SA Nocera watched the CI arrive at the Lay Avenue residence, leave the Lay Avenue residence at the conclusion of the controlled buy, and return directly to the designated meeting place. The controlled buy mostly monitored by the police in real-time, and the facts of the controlled buy were confirmed by the CI. Such evidence offers strong support for a finding of probable cause. See United States v. Keszthelyi, 308 F.3d 557, at * 566-67 (6th Cir. Oct. 17, 2002). Furthermore, SA Nocera recovered the crack cocaine from the CI after she left the Lay Avenue residence , field tested it to determine it was crack cocaine, and determined she was no longer in possession of the $500 he gave her to make the purchase. Based on the totality of the circumstances, SA Nocera's knowledge at the time he arrested Defendant Bennett was sufficient to warrant a reasonable person to believe that a drug offense had been committed by Defendant, thus

his arrest was supported by probable cause.

## B. Search of Defendant's Vehicle Subsequent to his Arrest

Inasmuch as SA Nocera had probable cause to arrest Defendant in light of the information received as a result of the controlled buy between the Defendant and the CI, he was entitled to search Defendant's vehicle incident to his arrest since contact was initiated "while Defendant [was] within his automobile" and he was "subsequently remove[d]" by the police. United States v. Straham, 984 F.2d 155, 159 (6th Cir. 1993). When the occupant of a vehicle is lawfully arrested, the passenger compartment of the vehicle and any containers therein may be searched without a warrant or further showing of probable cause. See New York v. Belton, 453 U.S. 454 (1981); United States v. Riascos-Suarez, 73 F.3d 616, 625 (6th Cir.), cert. denied 519 U.S. 848 (1996). In this case, Defendant was lawfully arrested while sitting in his Cadillac. SA Nocera then removed Defendant Bennett from the vehicle, handcuffed him, and searched the vehicle. As such the items seized from Defendant's Cadillac, including a quantity of crack cocaine, cash money, and a 9mm Glock semiautomatic pistol, were the result of a proper search incident to a legal arrest. See United States v. Patterson, 993 F.2d 121 (6th Cir. 1993) (holding that it is permissible to search a suspect's vehicle incident to arrest even if the defendant was previously handcuffed).

## VI. Conclusion

After carefully considering the evidence introduced during the course of the evidentiary hearing and after reviewing the relevant legal authorities, it is clear there is no basis to suppress any evidence seized in this case. For the reasons set forth herein, it is **RECOMMENDED** that Defendant Bennett's Motion to Suppress Physical Evidence **[Doc. 56]** be **DENIED**.[2]

Respectfully submitted,

  s/ C. Clifford Shirley, Jr.  
United States Magistrate Judge

---

[2] Any objections to this Report and Recommendation must be served and filed with the clerk of the court within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b), Fed. R. Civ. P. Failure to file objections within the time specified waives the right to appeal the District Court's order. Thomas v. Arn, 474 U.S. 140 (1985). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).